IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| AMERICAN HUMANIST ASSOCIATION, et al. | : | |
| v. | : | Civil Action No. DKC 14-0550 |
| MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION | : | |
| | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this Establishment Clause case is a motion for summary judgment filed by Plaintiffs American Humanist Association, Steven Lowe, Fred Edwords, and Bishop McNeill. (ECF No. 80).[1] Also pending are cross-motions for summary judgment filed by Defendant Maryland-National Capital Park and Planning Commission (the "Commission") (ECF No. 86) and Intervenor-Defendants American Legion, The American Legion Department of Maryland, and The American Legion Colmar Manor Post 131. (the "American Legion") (ECF No. 83).[2]

---

[1] Plaintiffs' initial motion for summary judgment (ECF No. 78) contained a separate statement of undisputed facts that was outside the length limitations found in Local Rule 105.3, as amended by court order. Plaintiffs' corrected motion for summary judgment is the operative motion. (ECF No. 80).

[2] Because the American Legion filed its motion for summary judgment only to assist the Commission in its defense, the two motions will be considered together. *See Hewett v. City of King*, 29 F.Supp.3d 584, 598 (M.D.N.C. 2014). Accordingly, the

Finally, three motions for leave to file memoranda as *amici curie* are pending. (ECF Nos. 94; 95; 96). The relevant issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Plaintiffs' motion for summary judgment will be denied and Defendants' motions for summary judgment will be granted. The motions for leave to file as *amici curie* will be denied.

## I.   Background

### A.   Factual Background[3]

Standing at the intersection of Maryland Route 450 and U.S. Route 1 in Bladensburg, Maryland, is a memorial monument consisting, in part, of a large concrete Latin cross that is approximately forty feet tall. (ECF No. 83-6). Plaintiffs denoted the memorial as "The Bladensburg Cross" in the complaint, but acknowledge that it is also referred to as the "Peace Cross." Other references in the record use the name "Memorial Cross." Defendants use the term "Bladensburg Memorial" or some variation. In this opinion, except when referring to the name used in an historical reference, the term "Monument" will be used. The Monument and the median are currently owned by the Commission. (ECF Nos. 83-44; 83-45).

_____

Commission and the American Legion will be collectively referred to as the "Defendants."

[3] Unless otherwise noted, the following facts are undisputed.

The symbol of the American Legion is displayed in the middle of both faces of the cross. (ECF No. 83-2). The cross sits on a rectangular base, and the West face of the base contains a plaque listing the names of forty-nine men from Prince George's County who died in World War I. The plaque also reads: "This Memorial Cross Dedicated to the heroes of Prince George's County Maryland who lost their lives in the Great War for the liberty of the world," and includes a quotation from President Woodrow Wilson. Four words are inscribed directly above the base, on the bottom of the cross itself, one on each face: "valor; endurance; courage; devotion." An American flag flies on one side of the cross.

### 1. Creation of the Monument

The initial effort to construct and finance the Monument began in late 1918 and early 1919, led by a group of private citizens organized as the Prince George's County Memorial Committee (the "Memorial Committee"). (ECF Nos. 83-4, at 2; 83-10, at 4; 83-14; 83-25, at 2; 83-36, at 3). The fundraising effort garnered significant publicity at the time, including reports highlighting the link between the Monument and the National Defense Highway. (ECF No. 83-31). These early organizers circulated fundraising pledge sheets that read:

> We, the citizens of Maryland, trusting in God, the supreme ruler of the universe, pledge faith in our brothers who gave their

>   all in the World War to make the world safe
>   for democracy. Their mortal bodies have
>   turned to dust, but their spirit lives to
>   guide us through life in the way of
>   godliness, justice, and liberty.
>
>   With our motto, "one god, one country
>   and one flag," we contribute to this
>   memorial cross commemorating the memory of
>   those who have not died in vain.

(ECF No. 80-32, at 3). The Memorial Committee circulated a fundraising flyer announcing the upcoming creation of the Monument and the National Defense Highway (now Maryland Route 450), which runs from Bladensburg to Annapolis. (ECF No. 83-25, at 2). The flyer noted that the "Memorial Cross will stand in a strategic position at the point where the Washington-Baltimore Boulevard joins the Defense Highway leading from Washington to Annapolis." (*Id.* at 3). The flyer also explained that:

>   those who come to the Nation's Capital to
>   view the wonders of its architecture and the
>   sacred places where their laws are made and
>   administered may, before this Cross,
>   rededicate[] themselves to the principles of
>   their fathers and renew the fires of
>   patriotism and loyalty to the nation which
>   prompted these young men to rally to the
>   defense of the right. And here the friends
>   and loved ones of those who were in the
>   great conflict will pass daily over a
>   highway memorializing their boys who made
>   the supreme sacrifice.

(*Id.*).

A groundbreaking ceremony was held for the Monument and the National Defense Highway on September 28, 1919. (ECF No. 83-4, at 4). At the time of the groundbreaking, the land was owned by

the Town of Bladensburg (the "Town"). (ECF Nos. 83-6, at 10; 83-37; 90, at 17; 92, at 10). Families of the veterans participated in the ceremony, and Josephus Daniels, then-Secretary of the Navy, was the primary speaker. (ECF Nos. 83-9, at 5; 83-10, at 15). Secretary Daniels addressed both the Monument and the National Defense Highway: "A concrete highway . . . that will never fail in rain or sun, that every day in the year will present an unalterable face to every duty expected of it, as did the men in whose honor it was named; and a cross that will stand for time and eternity, like the principles they defended." (*Id.*). According to records from the Prince George's County Historical Society Library, "The Marine Band provided music, several speeches were given by local officials and the exercises were concluded by the singing of The Star Spangled Banner." (ECF No. 83-10, at 15 (internal quotation marks omitted)).

The Memorial Committee continued its fundraising efforts, but ultimately failed to raise enough money and abandoned their efforts in 1922. (*Id.* at 16). Because construction on the Monument had begun but was unfinished, the local post of the American Legion (the "Snyder-Farmer Post") assumed responsibility for completing the Monument. (ECF Nos. 83-12, at 26-27; 83-36, at 4-5). The parties dispute if the Town

officially transferred the land to the Snyder-Farmer Post.[4] (*See* ECF Nos. 83-1, at 30; 90, at 17). In 1922, the Town passed a resolution that:

> authorize[d] the Snyder-Farmer Post of the American Legion to complete said Cross and its surroundings in such manner as the Post may deem advisable; and, to this end, the Town Commissioners of Bladensburg, Maryland do hereby assign and grant to the said Snyder-Farmer Post #3, American Legion, that parcel of ground upon which the cross now stands and that part necessary to complete the park around said cross, to the perpetual care of Snyder-Farmer Post #3 as long as it is in existence, and should the said Post go out of existence the plot to revert to the Town of Bladensburg, together with the cross and its surroundings.

(ECF No. 83-37). Counsel for the Snyder-Farmer Post contended that this resolution was recorded in the land records of Prince George's County on April 30, 1935. (*See* ECF No. 83-45, at 2). Subsequent historical accounts appear to note either that the Town did in fact officially convey the land to the American Legion post (*see, e.g.*, ECF Nos. 80-24, at 2; 80-33, at 4; 83-4, at 3; 83-10, at 16) or express uncertainty about the ownership history of the land (*see* ECF No. 92-2, at 2).

The Snyder-Farmer Post succeeded in raising the funds required to complete the Monument. (ECF No. 83-4, at 4). The

---

[4] The legal ownership of the land from 1922 until 1956 is disputed, but this fact is not material to the outcome of this case. The record indicates that the Snyder-Farmer Post had control over the land from 1922 until 1956, and a government entity controlled the land at all other times.

Snyder-Farmer Post held a dedication ceremony for the Monument on July 12, 1925. (ECF Nos. 83-4, at 4; 83-39). According to a contemporaneous news account, Representative Stephen Gambrill of Maryland's Fifth Congressional District delivered the keynote address, stating, in part:

> Where we of the past generation have failed to prevent war, perhaps you young men of the American Legion or the mothers who gave their sons to the conflict may succeed.

And

> You men of Prince George's county fought for the sacred right of all to live in peace and security and by the token of this cross, symbolic of Calvary, let us keep fresh the memory of our boys who died for a righteous cause.

(ECF No. 83-39). The Army Music School band provided music for the dedication, local officials and figures delivered remarks, and local clergy offered an invocation and benediction. (ECF Nos. 80-28).

### 2. Subsequent Control and Use of the Monument and Veterans Memorial Park

In 1935, due to increased traffic on the roads surrounding the Monument, the Maryland state legislature "authorized and directed" the State Roads Commission "to investigate the ownership and possessory rights" of the area surrounding the Monument and to acquire the land "by purchase or condemnation." (ECF No. 83-40, at 2). Plaintiffs contend that the tract of

land in question was *adjacent* to the Monument, but did not include the Monument itself – they maintain that the Monument has always been owned by a government entity. (ECF No. 90, at 19). Defendants assert that the Snyder-Farmer Post owned the Monument and the land on which it sat. (ECF Nos. 83-1, at 31-32; 92, at 10). The record is not entirely clear as to exactly what land was transferred and when. Ultimately, the State Roads Commission obtained title to the tract mentioned in the state statute and conveyed it to the Commission by deed in 1960. (ECF No. 83-44). On March 1, 1961, to resolve any ambiguities, the Snyder-Farmer Post "transfer[ed] and assign[ed] to [the Commission] all its right, title and interest in and to the Peace Cross, also originally known as the Memorial Cross, and the tract upon which it is located and surrounded and bounded by the curbings and boundary lines of the highways of the State Roads commission adjoining the said Cross parcel." (ECF No. 83-45, at 4). The Commission "assume[d] the obligation of maintaining, repairing and otherwise caring for" the Monument, but the Snyder-Farmer Post reserved "the right and the privilege to hold memorial services to departed veterans and other ceremonies upon the parcel on appropriate dates and occasions." (*Id.* at 5). The Commission continues to own the Monument and the land on which it sits. (*See* ECF No. 83-13, at 6).

The Monument now sits amidst additional monuments as part of Veterans Memorial Park. (ECF No. 83-8, at 2). The National Park Service placed among the memorials a "Star-Spangled Banner National Historic Trail Marker" highlighting the Monument and the other monuments in the park. (ECF No. 86-11). In 1944, local American Legion posts dedicated a World War II memorial across the street from the Monument honoring the men and women of Prince George's County who died in that war. (ECF No. 83-9, at 7). Nearby, a plaque and tree commemorate the lives lost at Pearl Harbor. Following a joint public-private effort, a memorial to veterans of Korea and Vietnam was dedicated on July 4, 1983. (*Id.* at 8). In 2006, an arcing stone walkway bordered by a granite ledge and a garden was built in the park to remember lives lost on September 11th. (ECF Nos. 83-1, at 5; 86, at 7-8). In 2010, the Town and the Anacostia Trails Heritage Area, Inc. convened a task force to explore ideas for monuments and events to commemorate the 200th anniversary of the War of 1812 and the Battle of Bladensburg. (ECF No. 86-25, at 4). Currently, there is a War of 1812 memorial just north of the Monument, and the Commission is in the process of installing two thirty-eight-foot-tall statues of soldiers representing the British Army and the defending American forces of the Battle of Bladensburg. (*Id.*). Finally, Veterans Memorial Park includes a

flag display of the American flag, the Maryland flag, and the Prince George's County flag. (ECF No. 83-2, at 14).

Numerous events and gatherings have been held at the Monument and Veterans Memorial Park, the vast majority in commemoration of Memorial Day or Veterans Day. An invocation and benediction are often included. (ECF Nos. 80-41; 83-1, at 35-36; 83-9, at 6; 83-11, at 9-11). Local posts of the American Legion have hosted many of the Memorial Day and Veterans Day programs at the Monument and in the surrounding park, which often feature local government officials and representatives of other veterans' organizations. (ECF No. 83-11, at 9-11). The Town, through organizations such as the Bladensburg Patriotic Committee and the Bladensburg Promotional Committee, also has held events in conjunction with Memorial Day, Veterans Day, the Fourth of July, and in remembrance of September 11th at the Monument or in the surrounding park. (ECF Nos. 80-7, at 7-8; 83-11, at 12). The events generally follow the same format and include a presentation of colors, the national anthem, an invocation, a keynote speaker (typically a veteran, military, local government, or American Legion official), songs or readings, the laying of a wreath or flowers, a benediction, and a reception. (*See, e.g.*, ECF Nos. 80-51; 83-68). Local American Legion posts, the Town, the Commission, and other government entities have also hosted rededications and other

patriotic ceremonies at the Monument. (*See, e.g.*, ECF Nos. 80-50; 83-53). Although Defendants and the American Legion contend that no religious services have been held at the Monument, Plaintiffs point to a *Washington Post* column indicating that there were at least three Sunday religious services held at the Monument in 1931.[5] (ECF No. 80-41, at 6).

While the Monument was built with private donations, the Commission has devoted resources over the years to maintain and illuminate it. Bladensburg Rotarians funded the installation of lights to illuminate the cross in 1965. (ECF No. 80-47). The Commission funds routine maintenance and lighting of the Monument (ECF No. 80-11, at 13) and has spent at least $117,000 on the Monument, including $100,000 on significant renovations in 1985. (ECF Nos. 80-1, at 24; 80-50, at 8). In 2008, the Commission budgeted an additional $100,000 for further repairs

---

[5] Plaintiffs provide evidence supporting their assertion that some religious services were held at the Monument. On the other hand, their allegations regarding the involvement of the Ku Klux Klan with the Monument are not supported by the record. Plaintiffs point to news reports regarding Klan events in Prince George's County held in the 1920s, but only one of these reports, a community calendar entry in *The Washington Post*, mentions the Monument, noting that "Robed klansmen will direct persons desiring to attend from the peace cross at Bladensburg to the fiery cross at Lanham." (ECF No. 80-45, at 5). The rally was not held at the Monument and there is no indication that the Monument was an official meeting point. Plaintiffs' suggestion of some connection is simply wrong. (*See* ECF No. 92, at 22 n.7).

to the Monument that has not yet been entirely spent. (ECF No. 80-11, at 8).[6]

## B.  Procedural History

Plaintiffs commenced this action under 42 U.S.C. § 1983 on February 25, 2014, contending that the ownership, maintenance, and prominent display of the Monument on public property violates the Establishment Clause of the First Amendment of the United States Constitution, as applied to Maryland by the Fourteenth Amendment.  They seek a declaratory judgment, an injunction, nominal damages, attorneys' fees, and costs. (ECF No. 1).[7]  Defendant Commission filed an answer on April 28, 2014. (ECF No. 12).  Intervenor-Defendants American Legion, et al. filed a motion to intervene (ECF No. 14), which was granted on September 18, 2014 (ECF Nos. 46; 47).  On May 5, 2015, Plaintiffs filed the pending corrected motion for summary judgment. (ECF No. 80).  On June 10, 2015, Intervenor-Defendants filed the pending cross-motion for summary judgment and response in opposition to Plaintiffs' motion. (ECF No. 83). One day later, the Commission filed the pending cross-motion for summary judgment and response in opposition to Plaintiffs'

---

[6]  After this case was filed, the National Park Service placed the Monument on the National Register of Historic Places. (ECF No. 97-2).

[7]  The specific injunctive relief sought in the Motion for Summary Judgment includes removal of the Monument, its demolition, or removal of the arms. (ECF No. 80, at 2).

motion. (ECF No. 86). Plaintiffs filed a response in opposition to Defendants' motions (ECF No. 90), and Defendant-Intervenors replied (ECF No. 92).

On April 25, 2014, prospective *amici curiae* moved for leave to appear jointly as amicus curiae in support of Defendants and to file an amicus curiae memorandum. (ECF No. 11). By memorandum opinion and order issued on September 18, 2014, the undersigned granted in part the motion to appear jointly as amicus curiae and for leave to file an amicus curiae memorandum. (ECF Nos. 46; 47). The proposed *amici curiae* were permitted to participate as amicus curiae. The court noted, however, because no dispositive motions had yet been filed, the proposed memorandum submitted by the *amici curiae* would not be considered at that time. On September 15, 2015, the same prospective *amici curiae* filed an unopposed second motion for leave to file a memorandum in support of Defendants together with their memorandum. (ECF No. 94). On October 1, 2015, the Center for Inquiry filed a motion for leave to appear as amicus curiae in support of Plaintiffs and to file an amicus curiae memorandum. (ECF Nos. 95). Intervenor-Defendants do not oppose this motion, but the Center for Inquiry did not receive a response from Defendants. Also on October 1, 2015, the Council on American-Islamic Relations ("CAIR") filed a motion for leave to appear as amicus curiae in support of Plaintiffs and to file an amicus

curiae memorandum.    (ECF No. 96).    CAIR attempted to obtain
consent from Defendants and Intervenor-Defendants, but had not
received a response by the time of filing.

## II.  Standard of Review

A court may enter summary judgment only if there is no
genuine dispute as to any material fact and the moving party is
entitled to judgment as a matter of law.    Fed.R.Civ.P. 56(a);
*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Emmett v.
Johnson,* 532 F.3d 291, 297 (4th Cir. 2008).    Summary judgment is
inappropriate if any material factual issue "may reasonably be
resolved in favor of either party."  *Anderson v. Liberty Lobby,
Inc.,* 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash.
Sports Ventures, Inc.,* 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary
judgment 'may not rest upon the mere allegations or denials of
[his] pleadings,' but rather must 'set forth specific facts
showing that there is a genuine issue for trial.'"   *Bouchat v.
Balt. Ravens Football Club, Inc.,* 346 F.3d 514, 522 (4th Cir.
2003) (quoting former Fed.R.Civ.P. 56(e)).   "A mere scintilla of
proof . . . will not suffice to prevent summary judgment."
*Peters v. Jenney,* 327 F.3d 307, 314 (4th Cir. 2003).   "If the
evidence is merely colorable, or is not significantly probative,
summary judgment may be granted."  *Liberty Lobby,* 477 U.S. at
249-50 (citations omitted).    At the same time, the court must

construe the facts that are presented in the light most favorable to the party opposing the motion. *Scott v. Harris,* 550 U.S. 372, 378 (2007); *Emmett,* 532 F.3d at 297.

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC,* 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., *Federal Practice & Procedure* § 2720 (3d ed. 1998).

## III. Analysis

### A. Establishment Clause Jurisprudence and Framework

The First Amendment provides that "Congress shall make no law respecting an establishment of religion," U.S. Const. amend. I, and the Supreme Court of the United States has applied this principle against the states and their subdivisions through the Fourteenth Amendment. *See Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599, 608 (4th Cir. 2012) (citing *Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947)). Despite the straightforward simplicity of the clause, "[t]here is 'no single mechanical formula that can accurately draw the constitutional line'" in

every Establishment Clause case. *Myers v. Loudoun Cnty. Pub. Schs.*, 418 F.3d 395, 402 (4th Cir. 2005) (quoting *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Breyer, J., concurring)). Indeed, Establishment Clause jurisprudence is a law professor's dream, and a trial judge's nightmare. In the words of Justice Clarence Thomas, "Establishment Clause jurisprudence [is] in shambles." *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 132 S.Ct. 12, 13 (2011) (Thomas, J., dissenting from the denial of certiorari.)

Courts, including the United States Court of Appeals for the Fourth Circuit, often use the three-part test articulated by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to assess alleged violations of the Establishment Clause. *See, e.g.*, *Am. Atheists, Inc. v. Port Auth.*, 760 F.3d 227, 238 (2d Cir. 2014); *Moss*, 683 F.3d at 608; *Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010) (determining *Lemon* to be the "appropriate test"); *Am. Atheists, Inc. v. Davenport*, 637 F.3d 1095, 1117 (10th Cir. 2010) (noting that "the touchstone for Establishment Clause analysis remains the tripartite test set out in *Lemon*") (citations and internal quotation marks omitted); *Hewett v. City of King*, 29 F.Supp.3d 584, 611 (M.D.N.C. 2014)(deciding the case "[u]nder the *Lemon* framework"). Most recently, the Fourth Circuit has articulated the *Lemon* test as requiring that, to pass constitutional muster, "government

conduct (1) must be driven in part by a *secular purpose*; (2) must have a *primary effect* that neither advances nor inhibits religion; and (3) must not *excessively entangle* church and State." *Moss*, 683 F.3d at 608 (emphases in original) (citing *Lemon*, 403 U.S. at 612-13).

In 2005, a plurality of the Supreme Court recognized that, although commonly used, the *Lemon* test has not been uniformly applied to Establishment Clause cases. *Van Orden*, 545 U.S. at 684-86 (plurality opinion). In determining the constitutionality of a display of the Ten Commandments outside the Texas State Capitol, the plurality noted that the *Lemon* test "is not useful in dealing with [such] passive monument[s]." *Id.* at 686. Instead the plurality's "analysis [was] driven both by the nature of the monument and by our Nation's history." *Id.* Justice Breyer, in a controlling opinion concurring in the judgment, *see Trunk v. City of San Diego*, 629 F.3d 1099, 1107 (9th Cir. 2011) (recognizing that "Justice Breyer's concurrence provides the controlling opinion"); *Myers*, 418 F.3d at 402 (treating Justice Breyer's opinion as controlling), noted that in "borderline cases" there is "no test-related substitute for the exercise of legal judgment." *Van Orden*, 545 U.S. at 700 (Breyer, J., concurring). Such judgment "must reflect and remain faithful to the underlying purposes of the [Establishment

and Free Exercise] Clauses, and it must take account of context and consequences measured in light of those purposes." *Id.*

Not surprisingly, the parties disagree whether *Lemon* or *Van Orden* controls this case. (ECF Nos. 83-1, at 38; 90, at 36; 92 at 16). Courts deciding Establishment Clause cases post-*Van Orden* also disagree. The Fourth Circuit, immediately after *Van Orden*, applied Justice Breyer's "legal judgment" test from *Van Orden* to the exclusion of the *Lemon* test, in upholding a statute providing for daily, voluntary recitation of the Pledge of Allegiance in Virginia's public schools. *Myers*, 418 F.3d at 402. *Myers* is, however, the only Fourth Circuit case to cite to *Van Orden*. In recent years, the Fourth Circuit has continued to apply the *Lemon* test with no mention of *Van Orden*. *Moss*, 683 F.3d at 608; *Glassman*, 628 F.3d at 146; *see also Weinbaum v. City of Las Cruces*, 541 F.3d 1017, 1030 n.14 (10th Cir. 2008) ("Supreme Court Justices have harshly criticized *Lemon*. . . . Nevertheless, the *Lemon* test clings to life because the Supreme Court, in the series of splintered Establishment Clause cases since *Lemon* has never explicitly overruled the case."). Other courts have applied some hybrid form of the two tests. *See Salazar v. Buono*, 559 U.S. 700 (2010) (plurality opinion); *Trunk*, 629 F.3d at 1107. Ultimately, here, it is not necessary to resolve the legal conundrum. Both tests "require the [c]ourt to inquire into the nature, context, and history" of the

Monument and lead to the same result.  *See Hewett*, 29 F.Supp.3d at 611 (citing *Trunk*, 629 F.3d at 1107).  Even if Justice Breyer's opinion in *Van Orden* controls, the *Lemon* test remains a "useful guidepost[]" for the court's analysis.  *Van Orden*, 545 U.S. at 700 (Breyer, J., concurring).

**B.  *Lemon* Test**

As noted above, "[t]o pass muster under the Establishment Clause, government conduct must be driven in part by a *secular purpose*; (2) must have a *primary effect* that neither advances nor inhibits religion; and (3) must not *excessively entangle* church and State."  *Moss*, 683 F.3d at 608 (emphases in original) (citing *Lemon*, 403 U.S. at 612-13).  Additionally, as part of *Lemon*'s second prong, the Fourth Circuit examines "whether the governmental use of an object with religious meaning . . . ha[s] the effect of 'endorsing' religion."  *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 269 (4th Cir. 2005) (citing *Cnty. of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 593-94 (1989)).

**1.  Secular Purpose**

The secular purpose prong of the *Lemon* test "presents a 'fairly low hurdle, which may be cleared by finding a plausible secular purpose.'"  *Glassman*, 628 F.3d at 146 (quoting *Ehlers-Renzi v. Connelly Sch. of the Holy Child, Inc.*, 224 F.3d 283, 288 (4th Cir. 2000)).  The government's purpose need not be

"exclusively secular," *Jenkins v. Kurtinitis*, No. ELH-14-1346, 2015 WL 1285355, at *28 (D.Md. Mar. 20, 2015) (citing *Brown v. Gilmore*, 258 F.3d 265, 276 (4th Cir. 2001)), as long as the government action is not "entirely motivated by a purpose to advance religion." *Hewett*, 29 F.Supp.3d at 611 (citing *Lambeth*, 407 F.3d at 270). "Under applicable Supreme Court precedent, a 'legitimate secular purpose' supporting a challenged governmental action will suffice to satisfy the *Lemon* test's first prong . . . unless the alleged secular purpose is in fact pretextual." *Lambeth*, 407 F.3d at 270 (citing *Santa Fe Ind. Sch. Dist. V. Doe*, 530 U.S. 290, 308-09 (2000); *Lynch v. Donnelly*, 465 U.S. 668, 681 (1984)). Courts should "not lightly attribute unconstitutional motives to the government, particularly where [it] can discern a plausible secular purpose." *Hewett*, 29 F.Supp.3d at 612 (quoting *Davenport*, 637 F.3d at 1118) (internal quotation marks omitted).

Plaintiffs argue that displaying the Monument has a religious purpose. First, they argue that a Latin cross, which the Monument is, is "patently religious." (ECF No. 80-1, at 29-30). Plaintiffs also argue that the history of the cross "underscores its religious purpose." (*Id.* at 30-32). They also contend that the use of a religious symbol to achieve a secular goal is impermissible when a non-religious means will suffice. Defendants assert that the Commission's sole purpose for

acquiring the land in the 1960s was not religious because it acquired the land for "highway expansion, traffic safety, protection of the Legion's residual property interests, [and] historic preservation" reasons. (ECF No. 83-1, at 46). Defendants also argue that, even if the intent of the Monument's builders is relevant, the record shows that their intent was "commemorative rather than religious." (*Id.* at 47-52).

Although the Latin cross is undeniably a religious symbol, "[t]he fact that the monument conveys some religious meaning does not cast doubt on the [government's] valid secular purposes for its display." *Hewett*, 29 F.Supp.3d at 612 (citing *City of Elkhart v. Brooks*, 532 U.S. 1058, 1062 (2001)); *see also Buono*, 559 U.S. at 715 (plurality opinion) ("Although certainly a Christian symbol, the cross was not emplaced on Sunrise Rock to promote a Christian message."); *Mellen v. Bunting*, 327 F.3d 355, 374 (4th Cir. 2003) (assuming a secular purpose even though school-sponsored prayer "is plainly religious in nature"). Other courts have recognized that displaying a cross to honor fallen soldiers is a legitimately secular purpose, and does not always promote a religious message. *See Buono*, 559 U.S. at 715 (plurality opinion) (noting that "those who erected the cross intended simply to honor our Nation's fallen soldiers"); *Davenport*, 637 F.3d at 1118 (determining that the intent to use crosses for fallen state trooper memorials was not religious,

partly because it was inspired by crosses in military cemeteries).

The focus of the first *Lemon* prong is "on the *government's* purpose, not that of a private actor." *Davenport*, 637 F. 3d at 1118. The alleged government conduct challenged in the complaint is the "ownership, maintenance and prominent display on public property" of the Monument. (ECF No. 1 ¶ 55). The Commission's actions are clearly driven by a plausible, legitimate secular purpose. The Commission owns the Monument and surrounding land because it sits in the median of a busy highway interchange. The government determined that private ownership of the median would "create a serious menace to traffic" in light of increased use of the surrounding roads. (ECF No. 83-40, at 2). It is the government's secular responsibility to maintain the land on which the Monument sits just as it would any other highway median. In addition, the Commission's maintenance and display of the Monument independent of traffic concerns is also driven by a secular purpose, maintaining and displaying a "historically significant war memorial" that has honored fallen soldiers for almost a century. *See Trunk*, 629 F.3d at 1108 (holding that the government, in acquiring a memorial in the shape of a cross, articulated a plausible, legitimate secular purpose of "preserv[ing] a historically significant war memorial"). Nothing in the record

indicates that the Commission's maintenance and display of the Monument is driven by a religious purpose whatsoever. The evidence of the Commission's secular purpose is uncontroverted.

Even the purpose of the private citizens who were behind the Monument's construction 90 years ago was a predominantly secular one. Plaintiffs refer to remarks made throughout the existence of the Monument in an attempt to illustrate its religious nature. (ECF Nos. 80-1, at 30-32; 90, at 52-55). Notably, a fundraising pledge sheet that was circulated contained expressly religious language (ECF No. 80-32, at 3 ("We, the citizens of Maryland, trusting in God, the supreme ruler of the universe, pledge faith in our brothers.")); the Monument was sometimes described in religious terms such as "Cross of Calvary" and "Sacrifice Cross" (ECF No. 80-26); and many events at the Monument contain some religious components (ECF Nos. 80-51; 83-68). Even if these statements or events carry some religious meaning, they do not show an "entirely religious purpose" for the Monument, and, in fact, there is overwhelming evidence in the record showing that the predominant purpose of the Monument was for secular commemoration. The Monument's groundbreaking was a predominantly secular affair that also included the groundbreaking of the National Defense Highway. (ECF No. 83-25, at 2-3). Additionally, although the construction of a cross can be for a religious purpose, in the

period immediately following World War I, it could also be motivated by "the sea of crosses" marking graves of American servicemen who died overseas. (ECF No. 83-5, at 14); *cf. Davenport*, 637 F.3d at 1118. The Monument's secular commemorative purpose is reinforced by the plaque, the American Legion's seal, and the words "valor," "endurance," "courage," and "devotion" written on it. None of these features contains any religious reference. In short, the record amply demonstrates that the construction and maintenance of the Monument "was not an attempt to set the *imprimatur* of the state on a particular creed. Rather, those who erected the cross intended simply to honor our Nation's fallen soldiers." *Buono*, 559 U.S. at 715 (plurality opinion).

The ownership, maintenance, and display of the Monument by the Commission thus easily satisfies the purpose prong of the *Lemon* test.

### 2. Primary Effect

*Lemon*'s second prong requires the court to determine if the challenged display's "principal or primary effect is to advance or inhibit religion." *Lambeth*, 407 F.3d at 270. The primary question is "whether an informed, reasonable observer would view the display as an endorsement of religion." *Id.* at 272. "[T]he reasonable observer is aware of the *purpose, context, and history* of the symbol at issue." *Hewett*, 29 F.Supp.3d at 613

(emphasis in original)(quoting *Davenport*, 637 F.3d at 1119).

"The inquiry is not 'whether there is *any* person who could find an endorsement of religion, whether *some* people may be offended by the display, or whether *some* reasonable person *might* think [the government] endorses religion.'"[8] *Id.* at 613 (emphases in original) (quoting *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 780 (1995) (O'Connor, J., concurring in part and concurring in the judgment)). The Ninth Circuit noted that in determining the effect of symbols such as the Monument, courts "must consider fine-grained, factually specific features of the Memorial, including the meaning or meanings of the Latin cross[,] . . . the Memorial's history, its secularizing elements, its physical setting, and the way the Memorial is used." *Trunk*, 629 F.3d at 1110. "Secular elements, coupled with the history and physical setting of a monument or display, can — but do not always — transform sectarian symbols that otherwise would convey a message of government endorsement of a particular religion." *Id.* at 1117. The Ninth Circuit's framework provides a helpful approach to assessing the effect of the Monument, which is similar, but not identical, to the memorial at issue in *Trunk*.

---

[8] It is for this reason that the parties' inclusion of individuals' reactions to the Monument is not particularly relevant or helpful for the reasonable person analysis.

Plaintiffs argue that the Monument endorses religion because, "as a Christian cross, it is inherently religious." (ECF No. 90, at 56). Additionally, Plaintiffs assert that the prominence of the Monument on the traffic island and relative isolation from the other memorials in Veterans Memorial Park enhance its endorsement of religion. Finally, Plaintiffs argue that the history and use of the Monument "deepens its religious message." (ECF No. 80-1, at 43). Defendants counter that the Monument contains numerous secular commemorative aspects that would indicate to the reasonable observer that its purpose is commemorative rather than religious. (ECF No. 83-1, at 55). Defendants also contend that the location of the Monument within Veterans Memorial Park further supports its secular effect. (*Id.* at 56-57). Defendants also argue that the historical use of the Monument for veterans' commemorative events strengthens its secular effect.

Plaintiffs cite multiple cases addressing a cross memorial on public land to support the proposition that "courts have been virtually unanimous in concluding that the government's display of a cross on public property unconstitutionally endorses and advances Christianity." (ECF No. 80-1, at 37). This assertion ignores the key factual distinctions between the cases Plaintiffs cite and the Monument. In *Trunk*, for example, the history and setting of the cross memorial were overtly

religious.  The cross in *Trunk* sat from 1913 until the 1990s as
an unadorned cross without "any physical indication that it was
a memorial."  *Trunk*, 629 F.3d at 1102.  Rather than hosting
annual commemorative events on Memorial Day and Veterans Day,
the *Trunk* cross hosted religious Easter services and only a "few
scattered [veterans] memorial services before the 1990s."  *Id.*
Throughout its history, the *Trunk* cross "functioned as a holy
object, symbol of Christianity, and a place of religious
observance."  *Id.* at 1120.  The Ninth Circuit suggested that the
*Trunk* cross was repurposed primarily as a war memorial partly in
response to litigation.  *Id.* at 1102.  The cross memorials at
issue in other cases were similarly imbued with long-standing
and explicit religious histories.  *See, e.g.*, *Separation of
Church and State Comm. v. City of Eugene*, 93 F.3d 617 (9th Cir.
1996) (cross was initially erected for religious purposes but
later deemed to be a "memorial of veterans to all wars");
*Gonzales v. North Tp. Of Lake Cnty., Ind.*, 4 F.3d 1412 (7th Cir.
1993) (lone crucifix with no secular effect other than "landmark
status"); *Am. Civil Liberties Union of Ga. v. Rabun Cnty.*, 698
F.2d 1098 (11th Cir. 1983) (cross was dedicated on Easter and
only secular purpose was tourism).  Conversely, the Monument
contains secular elements on its face (the plaque; the American
Legion Seal; the words "valor," "endurance," "courage,"
"devotion"), has functioned expressly and overtly as a war

memorial for its entire history, and sits amidst other secular memorials in Veterans Memorial Park. Although the record indicates that there were three isolated religious services held at the Monument, the predominant and nearly exclusive use of the Monument has been for annual commemorative events held on Memorial Day and Veterans Day. (*See* ECF Nos. 80-51; 83-60, at 18).[9] In light of this history and context, of which a reasonable observer would be aware, the Monument "evokes far more than religion. It evokes thousands of small crosses in foreign fields marking the graves of Americans who fell in battles, battles whose tragedies are compounded if the fallen are forgotten." *Buono*, 559 U.S. at 721 (plurality opinion). The evocation of foreign graves is particularly relevant here because, unlike crosses challenged in other cases, the Monument explicitly memorializes forty-nine servicemen who died in Europe during World War I, and the "cross developed into a central symbol of the American overseas cemetery" during and following World War I. (*See* ECF Nos. 83-5, at 16-17; 83-21).

Controlling Fourth Circuit precedent also supports Defendants' assertion that the Monument does not have the effect

---

[9] Plaintiffs refer to invocations and benedictions at these events as "prayers." Such activities at public ceremonies, outside of the public school context, generally do not violate the Establishment Clause. *Town of Greece, N.Y. v. Galloway*, 134 S.Ct. 1811 (2014); *Newdow v. Roberts*, 603 F.3d 1002, 1019-21 (D.C.Cir. 2010) (Kavanaugh, J., concurring in the judgment), *cert. denied*, 131 S.Ct. 2441 (2011).

of endorsing religion. The Fourth Circuit has addressed other passive displays of alleged religious significance in *Lambeth* and *Smith v. Cnty. of Albemarle, Va.*, 895 F.2d 953 (4th Cir. 1990). In *Lambeth*, the Fourth Circuit held that the inscription of the motto "In God We Trust" on the county government center did not violate the Establishment Clause because a reasonable observer would not "fairly understand the purpose of the message 'in its particular physical setting' to impermissibly advance or endorse religion." *Lambeth*, 407 F.3d at 272 (quoting *Cnty. Of Allegheny*, 492 U.S. at 598-600). In *Smith*, the Fourth Circuit held that a crèche scene on the front lawn of the county office building did violate the Establishment Clause because it "was not associated with any secular symbols or artifacts" other than a small disclaimer that the display was not sponsored by the government, but rather by the Charlottesville Jaycees." *Smith*, 895 F.2d at 958. Here, the Monument is surrounded by secular symbols of commemoration throughout Veterans Memorial Park. (ECF No. 83-3). The cross itself is adorned with prominent secular symbols. (ECF No. 83-2). In addition, rather than being placed prominently in front of a governmental building, the Monument is on a highway median as part of a larger park that has become the "focus of the County's remembrance of its veterans and war dead." (ECF No. 83-8, at 2). Within the context of its long history and the setting of Veterans Memorial

Park, a reasonable observer would not view the Monument as having the effect of impermissibly endorsing religion.

### 3. Excessive Entanglement

*Lemon*'s third prong requires courts to assess whether "the challenged display has created an 'excessive entanglement' between government and religion." *Lambeth*, 407 F.3d at 272-73. The Fourth Circuit has noted that "[t]he kind of excessive entanglement of government and religion precluded by *Lemon* is characterized by 'comprehensive, discriminating, and continuing state surveillance' of religious exercise." *Id.* at 273 (quoting *Lemon*, 403 U.S. at 619). Considering the inscription of "In God We Trust" in the county government center, the Fourth Circuit held that it was not excessive entanglement because the display did "not require pervasive monitoring or other maintenance by public authorities." *Id.* Here, Plaintiffs argue that the Commission's "expenditure of funds to maintain and light" the Monument excessively entangles government and religion.[10] (ECF No. 80-1, at 53). However, "entanglement between church and state becomes constitutionally excessive only when it has the effect of advancing or inhibiting religion." *Hewett*, 29

_____

[10] Plaintiffs also argue that the existence of the cross creates "religion-based political division" in violation of *Lemon*'s third prong. (ECF No. 80-1, at 52). The Fourth Circuit has indicated, however, that this "political divisiveness rubric" is limited to assessing government funding of religious schools, and "is thus inapplicable to the circumstances of this case." *Lambeth*, 407 F.3d at 273.

F.Supp.3d at 618 (citations and internal quotation marks omitted). Accordingly, courts often view *Lemon*'s third prong "as an aspect of the second." *Id.* Here, for reasons discussed in the preceding section, the Commission's display and maintenance of the Monument is not an endorsement of religion. The Monument and Veterans Memorial Park are secular war memorials that host numerous commemorative events. The Monument is located on a median of a busy highway interchange. The fact that the Commission has spent money on maintenance and upkeep of the Monument and surrounding park does not represent unconstitutional entanglement because the Monument itself is not a governmental endorsement of religion. The provision of maintenance and repairs for the Monument and the median does not constitute "continued and repeated government involvement with *religion*." *Lambeth*, 407 F.3d at 273 (emphasis added). Rather, as discussed in relation to *Lemon*'s purpose prong, the Commission undertakes maintenance of the Monument and surrounding land for traffic safety and commemorative purposes. In short, the Commission's maintenance of a war memorial on a highway median does not implicate any of the evils against which *Lemon*'s third prong protects.

### C. *Van Orden*

Despite continued judicial use of the *Lemon* test to assess the constitutionality of such displays, a 2005 plurality of the

Supreme Court determined that the *Lemon* test "is not useful in dealing with [such] passive monument[s]." *Van Orden*, 545 U.S. at 686 (plurality opinion).[11]  The Fourth Circuit applied the "legal judgment" test from Justice Breyer's *Van Orden* concurrence in holding that reciting the Pledge of Allegiance in public school did not violate the Establishment Clause. *Myers*, 418 F.3d at 402.  The Ninth Circuit applied a hybrid of *Lemon* and *Van Orden* in determining that the cross in *Trunk* was unconstitutional. *Trunk*, 629 F.3d at 1107.

Here, for many of the same reasons discussed in the application of the *Lemon* test, the Monument does not violate the Establishment Clause under *Van Orden*'s legal judgment test.  As in *Lemon*, it is essential to consider the context and history of the display to determine its constitutionality. *See Van Orden*, 545 U.S. at 701 (Breyer, J., concurring).  The Monument was constructed and financed by the American Legion and a private group of citizens whose purpose was to remember and honor Prince George's County's fallen soldiers. *See Van Orden*, 545 U.S. at 701 (Breyer, J., concurring) (noting the secular purpose of the display's founders).  The American Legion's seal is "displayed

_____

[11] Justice Breyer noted that *Van Orden* was most applicable in "borderline cases" because applying *Lemon* would be difficult. *Van Orden*, 545 U.S. at 700 (Breyer, J. concurring).  The facts, history, and context of the Monument do not present a particularly difficult "borderline" *Lemon* analysis.  A brief discussion of *Van Orden* is warranted, however, due to the uncertain status of Establishment Clause jurisprudence.

on the [Monument], prominently acknowledg[ing] that the [American Legion] donated the display, a factor which, though not sufficient, thereby further distances" the Commission from any potential religious aspect of the Monument. *Id.* Furthermore, the Monument is located in Veterans Memorial Park and is surrounded by other war memorials and secular monuments. (ECF No. 83-3); *see Van Orden*, 545 U.S. at 702 (Breyer, J., concurring) ("The physical setting of the monument, moreover, suggests little or nothing of the sacred."). Much like the Ten Commandments display in *Van Orden*, the location of the Monument "does not readily lend itself to meditation or any other religious activity." *Van Orden*, 545 U.S. at 702 (Breyer, J., concurring). Rather, the location among the other monuments of Veterans Memorial Park underscores its secular and commemorative nature. In addition, the Monument has gone unchallenged for decades. *See id.* at 702-03 (discussing how the fact that the monument existed for 40 years before a legal challenge shows that "few individuals . . . [were] likely to have understood the monument as amounting, in any significantly detrimental way, to a government effort" to promote or endorse religion). Finally, the Monument has been used almost exclusively as a site to commemorate veterans on secular patriotic holidays for its entire history. (ECF Nos. 80-41; 83-1, at 35-36; 83-9, at 6; 83-11, at 9-11; 83-60, at 18). As the Ninth Circuit

acknowledged in *Trunk*, "[t]he Ten Commandments monuments at issue in [*Van Orden*] passed muster in part because they were *not* used as religious objects — they simply adorned the grounds of their respective government buildings in the company of other monuments." *Trunk*, 629 F.3d at 1120. Conversely, the cross in *Trunk* had a long history of hosting religious Easter services and had "no physical indication of any secular purpose" for much of its history, "during which it served primarily as a site of religious observance." *Id.* at 1121.

For the foregoing reasons, the Monument satisfies both the *Lemon* test and the "legal judgment" test from *Van Orden*.

**D. Motions for Leave to File *Amici Curie* Memoranda**

Also pending are three motions for leave to file a memorandum as amicus curiae. One motion was filed in support of Defendants on September 15, 2015 by the same eleven individuals and the Veterans of Foreign Wars of the United States who filed in 2014, and the motion contains a memorandum that is "essentially identical to the original memorandum" previously filed. (ECF No. 94). On October 1, 2015, two motions in support of Plaintiffs were filed by the Center for Inquiry Responses and CAIR. (ECF Nos. 95; 96). Memoranda are not attached to these two motions for leave. As the undersigned discussed in a prior memorandum opinion:

There is no Federal Rule of Civil Procedure that applies to motions for leave to appear as amicus curiae in a federal district court. District courts therefore have discretion whether to grant or deny such leave and often look for guidance to Rule 29 of the Federal Rules of Appellate Procedure, which applies to amicus briefs at the federal appeals level. *See, e.g.*, *Jin v. Ministry of State Sec.*, 557 F.Supp.2d 131, 136 (D.D.C. 2008); *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp.2d 720, 728 (D.Md. 1996); *Washington Gas Light Co. v. Prince George's County Council,* Civ. No. DCK-08-0967, 2012 WL 832756, at *3 (D.Md. Mar. 9, 2012). Rule 29 indicates that *amici* should state "the reason why an amicus brief is desirable and why the matters asserted are relevant to the disposition of the case." Fed.R.App.P. 29(b)(2). As noted by Judge Davis in *Bryant*, "[t]he aid of *amici curiae* has been allowed at the trial level where they provide helpful analysis of the law, they have a special interest in the subject matter of the suit, or existing counsel is in need of assistance." *Bryant*, 923 F.Supp.2d at 728 (citing *Waste Mgmt. of Pa., Inc. v. City of New York*, 162 F.R.D. 34, 36 (M.D.Pa. 1995)).

(ECF No. 46, at 5-6). At this point, the issues have been comprehensively and fully briefed by all parties. Although the prospective *amici* have demonstrated a special interest in the outcome of the suit, there are no indications that the proposed memoranda would provide helpful legal analysis beyond the thorough job done by the parties' counsel. Accordingly, the motions filed by prospective *amici curiae* will be denied and the court will not consider any documents filed by movants.

## IV. Conclusion

For the foregoing reasons, the motion for summary judgment filed by Plaintiffs American Humanist Association, et al. will be denied. The motions for summary judgment filed by Defendant Maryland-National Capital Park and Planning Commission and Intervenor-Defendants American Legion, et al. will be granted. The motions for leave to file memoranda of *amici curiae* will be denied. An appropriate declaration will be entered. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge